No. 95-1289

Laura Keevan; Verna Mae Jones;   *
Sheila Gordon; Melissa Ann   *
Wagner; Laverna Goree; Tanya   *
Goins; Carol Jean Klaus, and   *
on behalf of the class,   *
   *
      Appellants,   *
   *
   v.   *
   *
Donald Smith, Superintendent   *   Appeal from the United States
of Fulton Reception and   *   District Court for the
Diagnostic Center; Ron Schmitz,   *   Western District of Missouri.
Superintendent of Kansas City   *
Community Release Center; Janet   *
Schneider, Superintendent of   *
St. Louis Community Release   *
Center; Thelma Grandison,   *
Superintendent of Chillicothe   *
Correctional Center; Donna   *
Schriro, Director of the   *
Department of Corrections,   *
   *
      Appellees.   *

Submitted:  May 16, 1996

Filed:  November 18, 1996

Before BOWMAN, HEANEY, and WOLLMAN, Circuit Judges.

BOWMAN, Circuit Judge.

Appellants, a certified class of female inmates who are now or who
may be in the future confined in Missouri penal institutions,

appeal a portion of the judgment of the District Court,[1] in favor of Missouri Department of Corrections and Human Resources (Department) officials. The women inmates originally brought this 42 U.S.C. § 1983 action against Department officials alleging discriminatory treatment and seeking injunctive relief. Only two issues have been raised in this appeal. The female prisoners contend that the District Court erred in rejecting their claims that prison officials discriminated against them on the basis of gender in violation of the Equal Protection Clause by failing to provide them with equal access (1) to post-secondary educational programs and (2) to prison industry employment. The District Court held that the availability of post-secondary educational courses hinged on fiscal decisions made by the academic providers and on a lack of demand by female inmates rather than on any discriminatory action taken by the Department. The Department has since filed a motion to dismiss as moot the female inmates' appeal regarding post-secondary educational opportunities. We agreed to take this motion into consideration with the merits of the case and hereby grant the Department's motion to dismiss this portion of the case as moot. To that extent, the order of the District Court is vacated. As to the prison industries claim, the District Court found insufficient evidence of discriminatory intent on the part of Department officials to support an equal protection challenge. Concluding that the District Court's finding of no discriminatory intent is not clearly erroneous, and further concluding that the female inmates are not similarly situated to male inmates for purposes of equal protection analysis, we affirm the District Court's order dismissing this claim.

---

[1]The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri, adopting the Report and Recommendation of The Honorable William A. Knox, United States Magistrate Judge for the Western District of Missouri.

**I.**

The facts of the case are not in dispute. Male and female inmates incarcerated within Missouri Department of Corrections prisons are segregated into particular facilities by gender.[2] The Department operates fifteen penal institutions, two of which, the Renz Correctional Center[3] (Renz) and the Chillicothe Correctional Center (Chillicothe), house solely adult female inmates. Corrected Joint Stipulations, Appellant's App. at 27. The vast majority of the total inmate population in adult institutions in Missouri, approximately ninety-five percent, is male. Id. at 28. Both male and female inmates are assigned custody level classifications ranging from minimum security, C1, to maximum security, C5, and these designations affect inmate housing assignments within the gender-segregated facilities. Generally, the higher custody classifications, C4 and C5, are assigned to male and female inmates with longer sentences to serve and to shorter-term inmates of both genders who represent an increased security risk. Female inmate custody levels range from C1 through C3 at Chillicothe and from C3 through C5 at Renz.

---

[2]Appellants do not challenge the constitutionality of this gender-based classification. See Women Prisoners of the Dist. of Columbia Dep't of Corrections v. District of Columbia, 93 F.3d 910, 926 (D.C. Cir. 1996); Pitts v. Thornburgh, 866 F.2d 1450, 1458-59 (D.C. Cir. 1989).

[3]The Magistrate Judge observed that, due to extensive flooding which occurred in July and August, 1993, Renz was evacuated and the female inmates at the facility were moved to facilities that normally house only male inmates, including Central Missouri Correctional Center (CMCC) and Fulton Reception and Diagnostic Center (FRDC). The majority of the females from Renz were moved to CMCC and will remain at that institution during the emergency conditions created by flood waters. Renz will not be reopened in the immediate future, if at all, due to considerable damage to the facility. Interim arrangements for educational classes and prison industries have been implemented.

Approximately 725 female inmates are incarcerated in the Department's female-only prisons, some 420 at Chillicothe and some 305 at Renz.[4] Approximately 13,000 male inmates are incarcerated in the Department's male-only prisons, some 1200 at Algoa Correctional Center; 900 at Booneville; 1200 at Central Missouri Correctional Center; 1800 at Farmington Correctional Center; 2000 at Jefferson City Correctional Center; 1265 at Moberly Correctional Center; 1100 at Missouri Eastern Correctional Center; 500 at Potosi Correctional Center; 2000 at Western Missouri Correctional Center; and 600 at Ozark Correctional Center.

Female inmates incarcerated at the Renz and Chillicothe facilities have access to the same adult basic education and G.E.D. programs as male inmates. Both male and female prisoners can take advantage of college-level correspondence courses at their own expense. Post-secondary courses conducted within the confines of the prison facilities are offered by community colleges, state universities, and private colleges, and not by the Department itself. Educational institutions enter into agreements with the Department for access to physical space within both male and female prisons and for administrative support, such as security and assistance in enrolling the inmates. Decisions regarding the number and variety of post-secondary programs offered at a particular prison facility are made by the educational institutions involved and not by the Department. The Department requires that any courses that the schools choose to offer be of the same quality as those the schools offer to their on-campus students.

Prison enterprises are operated by Missouri Correctional Enterprises (MCE), a private, self-supporting, profit-making enterprise that does not receive funding from the Missouri General

---

[4]Renz was originally a male institution, then housed both women and men, and finally became a women's prison in December 1989.

Assembly.  Twenty-one such enterprises are located at male institutions and three at female institutions.  Report and Recommendation at 10.  Male inmates have a broader range of industry job opportunities, but industries are located at both women's facilities and only at some of the male facilities.  Id.  For fiscal year 1991, approximately thirteen percent of the total female inmate population was employed in prison industry programs.  Corrected Joint Stipulations, Appellant's App. at 28, 36.  During the same time period, only eight percent of the total male inmate population was so employed.  Id.

## II.

We first consider the Department's motion to dismiss as moot the women prisoners' claim that Department officials purposely discriminated against them on the basis of gender in the management  of post-secondary educational opportunities.  During the pendency of this appeal, Department officials terminated their former practice of allowing outside educators access to male and female prison facilities for the purposes of providing college-level courses to inmates.  Affidavit of John J. Bell in support of Appellee's Motion to Dismiss Point I of Appellants' Appeal as Moot.  Neither male nor female prisoners are currently provided this opportunity, a fact appellants do not contest.

A claim is properly dismissed as moot if it "has lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract questions of law." Princeton Univ. v. Schmid, 455 U.S. 100, 103 (1982) (per curiam) (quotations and citations omitted) (holding that university's amendment of regulation made moot a challenge to regulations).  Where, as here,

> (1) it can be said with assurance that there is no reasonable
> expectation . . . that the alleged violation

will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation . . . it may be said that the case is moot because neither party has a legally cognizable interest in the final determination of the underlying questions of fact and law.

County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (quotations and citations omitted). Here, prison officials have abandoned the post-secondary educational programs about which the women prisoners complained.[5] There is no indication that Department officials will reinstate these educational programs. In these circumstances, the requested relief--equal access to such programs by both male and female inmates--has become an abstraction, and this aspect of the case has "lost its character as a present, live controversy." Schmid, 455 U.S. at 103 (quotation omitted). As a result, we conclude that the women prisoners' equal protection claim concerning post-secondary educational programs is moot and we grant the Department's motion to dismiss this claim. Those portions of the District Court's order dealing with this claim are vacated. United States v. Munsingwear, Inc., 340 U.S. 36, 39 (1950); Cranford v. Nix, 43 F.3d 1210, 1211 (8th Cir. 1995).

## III.

We turn now to the women's contention that Department officials' policy for determining the placement of prison industries is exercised in a manner that violates the Equal Protection Clause. To establish a gender-based claim under the Equal Protection Clause, the appellants must, as a threshold matter, demonstrate that they have been treated differently by a state actor than others who are similarly situated simply because

---

[5]At oral argument, counsel advised the Court that inmates no longer are able to secure federal financial assistance for enrolling in these educational programs. Colleges and universities that offered these programs at Department prisons have elected to discontinue the practice for economic reasons.

appellants belong to a particular protected class.  See, e.g., Klinger v. Department of Corrections, 31 F.3d 727, 731 (8th Cir. 1994), cert. denied, 115 S. Ct. 1177 (1995).  In general, the Equal Protection Clause requires that the government treat such similarly situated persons alike.  See, e.g., City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985); Klinger, 31 F.3d at 731; Moreland v. United States, 968 F.2d 655, 660 (8th Cir.) (en banc), cert. denied, 506 U.S. 1028 (1992).  Treatment of dissimilarly situated persons in a dissimilar manner by the government does not violate the Equal Protection Clause.  Klinger, 31 F.3d at 731; see Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp., 21 F.3d 237, 242 (8th Cir. 1994); Women Prisoners of the Dist. of Columbia Dep't. of Corrections v. District of Columbia, 93 F.3d 910, 924 (D.C. Cir. 1996).  Therefore, the initial inquiry in any equal protection claim is whether the plaintiff has established that she was treated differently than others who are similarly situated to her.  Klinger, 31 F.3d at 731; United States v. Whiton, 48 F.3d 356, 358 (8th Cir.), cert. denied, 116 S. Ct. 227 (1995).  As we observed in Klinger, "Absent a threshold showing that she is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim."  31 F.3d at 731.

Thus, before we may entertain the merits of the female inmates' equal protection claim, we must first determine whether women incarcerated by the Missouri Department of Corrections are similarly situated, for purposes of the program in issue, to men likewise incarcerated.  Whether the female inmates are similarly situated to male inmates requires an inquiry focusing on the purposes of the challenged government action, namely, the assignment of prison industry programs among the various institutions controlled by the Department.  See More v. Farrier, 984 F.2d 269, 271 (8th Cir.), cert. denied, 510 U.S. 819 (1993).

-7-

In _Klinger_, this Court was asked to determine whether female prisoners, all of whom were incarcerated at the Nebraska Center for Women (NCW), were subjected to gender discrimination by the Department of Correctional Services in violation of the Equal Protection Clause due to the alleged inferiority of the vocational, educational, and employment opportunities and programs offered to women in comparison to those offered to male prisoners incarcerated at Nebraska State Penitentiary (NSP), one of a number of male-only prisons. 31 F.3d at 729. This Court held, as a matter of law, that female inmates at NCW and male inmates at NSP were not similarly situated for purposes of prison programs and services and, therefore, that the plaintiffs failed to establish a violation of the Equal Protection Clause. _Id._ at 731.

In arriving at our conclusion that the male and female inmates in _Klinger_ were dissimilarly situated, we considered a number of factors including prison population size, average length of sentence, security classification, types of crimes, and other special characteristics. _Id._ at 731-32; _see_ _also_ _Pargo v. Elliott_, 894 F. Supp. 1243, 1259 (S.D. Iowa 1995), _aff'd_, 69 F.3d 280 (8th Cir.), _cert. denied_, No. 95-8906, 1996 WL 271195 (U.S. Oct. 7, 1996). Because a comparison of these factors between the male inmates at NSP and the female inmates at NCW revealed a wide disparity in each category, this Court concluded that "the programs at NSP and NCW reflect separate sets of decisions based on entirely different circumstances." _Klinger_, 31 F.3d at 732. Programming decisions regarding industry and education differed from prison to prison, "depending on innumerable variables that officials must take into account" and not on illegitimate, discriminatory factors. _Id._ Analysis of the sort that we employed in _Klinger_ leads us to the same result in the present case.

Initially, the irrefutable differences between the female-only facilities, Renz and Chillicothe, and the various institutions housing male inmates in Missouri must be acknowledged. Most

-8-

notably, because women account for such a small proportion of the total prison population, their facilities are necessarily smaller in size than any of the male-only prisons.

Taking into account security classification levels in addition to population size further illustrates that female inmates are dissimilarly situated from male inmates. For example, Chillicothe has a population of 430 female inmates assigned the lowest classification levels ranging from C1 through C3. Corrected Joint Stipulations, Appellant's App. at 27, 28. The most comparable male institution with respect to population size, Potosi Correctional Center with 500 inmates, bears no resemblance to Chillicothe with respect to security levels, as it houses only male prisoners assigned the highest security classification, C5. Id. at 27. The male institutions most comparable to Chillicothe with respect to security classification, Central Missouri Correctional Center and Western Missouri Correctional Center, which both confine inmates classified at levels C2 and C3, house considerably larger inmate populations, namely, 1000 men at Central Missouri and 1975 men at Western Missouri. Id.

The average sentence length for female inmates as compared to male inmates confirms that these two diverse groups are not similarly situated. Significantly fewer female inmates will be serving lengthy prison sentences in comparison to male inmates. This observation is evidenced by the vast disparity in the number of female inmates classified as medium or maximum security risks as compared to the number of male inmates likewise classified. See Corrected Joint Stipulations, Appellant's App. at 27-28. A small number of women prisoners, approximately 305, are assigned the highest security classifications, thereby indicating that they will be incarcerated for extended periods of time. In contrast, roughly 6700 male inmates have been assigned the highest security classifications and will, therefore, likely be serving lengthy prison sentences. This distinction also tends to establish that

-9-

male inmates have been convicted of more serious crimes, thus justifying the higher security classifications associated with lengthier prison sentences.

As is apparent from the above observations, male and female inmates incarcerated in Department prisons are far from similarly situated for purposes of equal protection analysis. In determining the availability and location of prison programs and services, officials "must balance many considerations, ranging from the characteristics of the inmates at that prison to the size of the institution, to determine the optimal mix of programs and services." Klinger, 31 F.3d at 732; see Turner v. Safley, 482 U.S. 78, 84-85 (1987). Because these considerations are diverse and the circumstances of each prison are different, female inmates as a group and male inmates as a group simply cannot be considered similarly situated for purposes of comparing the availability and variety of prison programming. The size of the institution, its location, and the types of inmates housed there necessarily will affect the number, type, and length of programs offered.

The women prisoners urge this Court to conduct a program-by-program comparison between Department prisons housing solely female inmates and those housing only male inmates to confirm the existence of gender discrimination. We reject that approach to equal protection analysis of the Department's placement of prison industries. There can be no such meaningful comparison for equal protection purposes between two sets of inmates who are not similarly situated. See, e.g., Association of Residential Resources v. Gomez, 51 F.3d 137, 140-41 (8th Cir. 1995); Klinger, 31 F.3d at 733; Women Prisoners of the District of Columbia, 93 F.3d at 927. The substantial differences discussed above between male and female prisoners demonstrate the dissimilarity of the two distinct groups and the irrelevance of any attempt to compare the number or type of programs offered. Furthermore, this Court concluded in Klinger that "using an inter-prison program comparison

-10-

to analyze equal protection claims improperly assumes that the Constitution requires all prisons to have similar program priorities and to allocate resources similarly."  31 F.3d at 732.  We also noted that inter-prison program comparison "results in precisely the type of federal court interference with and 'micro-management' of prisons that Turner condemned." Klinger, 31 F.3d at 733 (following Turner v. Safley, 482 U.S. 78 (1987)).

For the foregoing reasons, we hold that male and female prisoners are not similarly situated for purposes of an equal protection comparison of prison industry programs.

## IV.

Even assuming, for the sake of argument, that male and female inmates were similarly situated for purposes of the Department's placement of prison industries, an equal protection review of Department decisions requires further analysis.  It must be determined whether the unequal treatment in accessibility to prison industry employment allegedly resulting from gender discrimination stems from a Department policy that is facially neutral or from a policy that, on its face, classifies by gender.  A facially gender-based classification is subject to heightened scrutiny and violates the Equal Protection Clause if the classification is not substantially related to the achievement of important governmental objectives.  United States v. Virginia, 116 S. Ct. 2264, 2275 (1996); Personnel Adm'r v. Feeney, 442 U.S. 256, 273 (1979); Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982).

A facially neutral policy, on the other hand, is not subject to the same exacting standard as it does not categorize on the basis of a quasi-suspect class.  If, however, a neutral policy employed by the Department has a disproportionately adverse effect upon women, it is unconstitutional under the Equal Protection

Clause only if that impact can be traced to a discriminatory purpose. <u>Feeney</u>, 442 U.S. at 272.

> When a statute gender-neutral on its face is challenged on the ground that its effects upon women are disproportionately adverse, a twofold inquiry is . . . appropriate. The first question is whether the statutory classification is indeed neutral in the sense that it is not gender based. If the classification itself, covert or overt, is not based upon gender, the second question is whether the adverse effect reflects invidious gender-based discrimination.

<u>Id.</u> at 274; see <u>Village of Arlington Heights v. Metropolitan Housing Dev. Corp.</u>, 429 U.S. 252, 264-66 (1977); <u>Marshall v. Kirkland</u>, 602 F.2d 1282, 1299 (8th Cir. 1979). If the adverse impact of a facially neutral policy cannot be plausibly explained on a neutral ground, the impact itself would signal that the real classification made by the policy was in fact not neutral.[6] <u>Feeney</u>, 442 U.S. at 275.

Here, the women prisoners do not challenge the Department policy of segregating male and female prisoners by gender. Rather they challenge the Department policy which determines the placement of a particular prison industry at a specific penal facility. It is this policy that the appellants contend results in a disparate impact on female prisoners and constitutes a violation of the Equal Protection Clause. The disparate impact, according to the female inmates, is evidenced through the placement of stereotypically female jobs at the Renz and Chillicothe facilities and the exclusion of female inmates from the more skilled and industrial jobs located at male prisons.

---

[6]As we noted in <u>Ricketts v. City of Columbia</u>, 36 F.3d 775, 781 (8th Cir. 1994), "in only a few cases, where a facially neutral policy impacted exclusively against one suspect class and that impact was unexplainable on neutral grounds, has the impact alone signalled a discriminatory purpose. <u>See</u> <u>Gomillion v. Lightfoot</u>, 364 U.S. 339 (1960); <u>Yick Wo v. Hopkins</u>, 118 U.S. 356 (1886)."

Initially, we note that the statutory provisions granting the Department authority to establish and monitor prison industries are gender-neutral on their face.  See, e.g., Mo. Rev. Stat. § 217.550 (1994). Likewise, a review of Department officials' testimony indicates that Department policy for the placement of prison industries is based on factors such as population size, availability of a steady work force, and location of the prison in relation to potential purchasers of industry products, not on the basis of gender considerations.  Department officials have countered the appellants' allegations of gender-motivated discrimination with a plausible explanation for the alleged disparate impact.  As such, it is appellants' burden to establish that the adverse effect this Department policy has on women inmates is the result of a discriminatory purpose.

The District Court found that the scope of prison enterprise opportunities provided to male and female inmates "appears directly related to the size and location of the prisons and a recognition that more male inmates are available for long-term manufacturing jobs than women inmates."[7]  Report and Recommendation at 10.

Because the policy challenged by the appellants is neutral on its face, the female prisoners must establish that the alleged disparate impact is the result of discriminatory purpose.  We agree with the District Court that appellants have failed to prove the requisite discriminatory intent on the part of Department officials.  Assuming as a threshold matter that the women prisoners

---

[7]The statutory mandate bestowing on the Department the power to establish prison industries instructs that the director shall take into account:  "offender custody levels, the number of offenders in each correctional center so the best service or distribution of labor may be secured, location and convenience of the correctional centers in relation to the other correctional centers to be supplied or served and the machinery presently contained in each correctional center."  Mo. Rev. Stat. § 217.550(1) (1994).

have demonstrated disparate impact, their equal protection claim will fail nonetheless without a showing of discriminatory intent.  See Feeney, 442 U.S. at 274; Arlington Heights, 429 U.S. at 265.  "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Feeney, 442 U.S. at 279 (citation and footnote omitted).

The District Court's findings show that prison industry jobs are located at both women's facilities and only at certain male facilities. Report and Recommendation at 10.  A proportionately larger number of female inmates have prison industry jobs than do male inmates, and the data-entry industry located at the Renz facility, criticized by plaintiffs as a stereotypically female occupation, formerly employed male inmates when the institution housed males.  Department officials testified that the location of prison industries was motivated not by stereotypes but by legitimate concerns such as work force stability and proximity to clientele.  Thus, as the District Court found, the evidence does not support a claim that the Department's placement of prison industry jobs was intentionally discriminatory or gender-motivated.  See also Klinger, 31 F.3d at 733-34; Pargo, 894 F. Supp. at 1280; Women Prisoners of the Dist. of Columbia, 93 F.3d at 925.

Because no two prisons are the same, it is a virtual certainty that inmates in one prison will have certain amenities not available to inmates in another.  "Thus, female inmates can always point out certain ways in which male prisons are 'better' than theirs, just as male inmates can always point out other ways in which female prisons are 'better' than theirs."  Klinger, 31 F.3d at 732; see also Women Prisoners of the Dist. of Columbia, 93 F.3d at 926-27.  "Differences between challenged programs at . . . prisons are virtually irrelevant because so many variables affect

the mix of programming that an institution has. . . . In short, comparing programs . . . is like the proverbial comparison of apples to oranges." Klinger, 31 F.3d at 733. When attempts are made to compare programs offered at facilities housing inmates who are not similarly situated, "it is hardly surprising, let alone evidence of discrimination, that the smaller correctional facility offered fewer programs than the larger one." Women Prisoners of the Dist. of Columbia, 93 F.3d at 925.

**V.**

For the reasons stated, we affirm the District Court's order dismissing the appellants' equal protection claim with respect to prison industry programs and grant the Department's motion to dismiss as moot appellants' equal protection claim regarding post-secondary educational opportunities. The order of the District Court is vacated insofar as it deals with the latter claim.

HEANEY, Circuit Judge, concurring in part and dissenting in part.

I agree that the female inmates' claim that prison officials purposefully discriminated against them in the management of post-secondary educational programs is rendered moot by the correction department's unfortunate suspension of all contracts with local colleges and universities to offer post-secondary and vocational courses to either male or female inmates. I disagree, however, with the majority's conclusion that the class of female inmates is not similarly situated to male inmates for the purpose of challenging the assignment and organization of prison industry programs under the Equal Protection Clause. I also disagree that the female inmates have failed to show discriminatory intent on the part of the Department of Corrections. Therefore, I respectfully dissent from Parts III and IV of the majority's opinion.

-15-

I do not quarrel with the majority's citation to the basic rule that a party seeking relief for gender-based discrimination under the Equal Protection Clause must demonstrate that a state actor has treated her differently than other similarly situated persons because of her gender. Nor do I dispute the corollary rule that a state may treat dissimilarly situated persons in a dissimilar manner. In my view, however, the court is wrong to adopt an overly formalistic approach to the threshold question of whether female and male inmates are similarly situated.

While the court in Klinger v. Department of Corrections, 31 F.3d 727, 731 (8th Cir. 1994), compared inmate populations, length of sentences, and security classifications in holding that female inmates at one Iowa prison were dissimilarly situated from male inmates at another institution, such factors should not be rigidly applied. As the majority artfully demonstrates, it is highly unlikely that any two institutions in a state's prison system will have an identical inmate composition but for the fact that one houses women and the other houses men; specific differences become more tenuous and less important when the challenge is system-wide. While the segregation of inmates by gender is constitutional, the natural consequences of that segregation--e.g., smaller institutions, shorter aggregate lengths of stay, broader ranges of security ratings within institutions--must not be used as a per se bar to our examination of the respective treatment women and men receive while incarcerated. If our equal protection inquiry ended every time a plaintiff fell short of showing different treatment at a mirror-image facility, then despite our admonition to the contrary, Klinger would "stand for the proposition that women and men prison inmates can never be similarly situated for purposes of equal protection analysis." Prago v. Elliot, 49 F.3d 1355, 1356 (8th Cir. 1995).

It is important not to lose sight of basic commonalities that justify similar treatment. All inmates, regardless of gender, are

under the custody and control of the state as a result of their criminal behavior; all are subject to the same general departmental regulations and policies; and the incarceration in all cases shares common goals, including the reform and rehabilitation of individual offenders. These common characteristics provide a basis for the Department of Corrections to design a program that gives substantially equal opportunities to women and men for rehabilitative work while confined. Although gross institutional differences might sometimes provide basis for finding groups of inmates dissimilarly situated, they do not in this case. General, legitimate concerns for security, the availability of inmates to fill positions, and the like are more relevant in examining whether dissimilar treatment of male and female inmates can be supported on non-discriminatory grounds.

Turning to that question, I further disagree with the majority's conclusion that the female inmates' claim must fail because they have not proved discrimination on the part of prison officials. The women have brought forth enough to establish gender-based discrimination. The department offers women only three opportunities to participate in industry jobs, whereas male inmates have the opportunity to participate in twenty-one, on-site enterprises as well as an off-site warehousing and trucking operation. The jobs for men require more skills and give the men a considerable market advantage outside the prison setting. Where the same type of operation is set up at both a men's and women's institution, the men's facility is significantly more sophisticated and industrial than the women's counterpart. For example, while men at Moberly work in a printing industry that is equipped to do layout work for forms, letterhead, and envelopes, the Quick Print operation for women at Renz is "closer to a copy center." App. at

231-32.  With very few exceptions,[1] the industrial opportunities offered to female inmates fall within prevailing stereotypes of "women's work": telephone operators/telemarketers; data entry; and office copying.  The Missouri Department of Corrections cannot adequately explain the disparities between the industrial opportunities for women and men on neutral grounds and, more important, cannot explain its unwillingness to expend the effort to provide women with the same opportunities it provides to men.  I disagree with the district court's statement, adopted by the majority, that the dissimilar treatment is directly related to the size and location of the prisons and to the greater long-term availability of male inmates.  Most of the industries could operate independent of their geographical location.  Moreover, as of 1991, only a handful of the industries at the men's institutions had staff sizes that might be difficult to generate at the women's institutions.  The state has not shown non-discriminatory reasons for determining the industrial opportunities it offers to female inmates.  The women, in contrast, have produced enough evidence from which to infer the Department of Corrections' industry placements are based on stereotypical notions of what jobs women can perform and the lesser need for women to become skilled laborers.

In my view, the women inmates have established their case under the Equal Protection Clause that the Missouri Department of Corrections discriminates against them on the basis of their gender in the assignment and organization of prison industries throughout the state's prison system. I would remand this case to the district court with directions to instruct the Department of

---

[1]For example, as of 1991, two women at Renz were employed in what is called an agri-business enterprise where they perform minor maintenance and repair jobs on small machines.  This operation, however, is a scaled-down version of what was in place when Renz housed male inmates and is quite different from and less skilled than the traditional cattle and crop farming work currently offered to male inmates at another Missouri institution.

Corrections to establish a remedial plan to correct the gender-based disparities.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.