# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 07-3780

_____

|  |  |  |
|---|---|---|
| | * | |
| Julie Roubideaux, individually and on behalf of a class of similarly situated persons; Shelly Grossman, individually and on behalf of a class of similarly situated persons, | * * * * * * | Appeal from the United States District Court for the District of North Dakota. |
| | * | |
| Appellants, | * * | |
| | * | |
| v. | * | |
| | * | [PUBLISHED] |
| | * | |
| North Dakota Department of Corrections and Rehabilitation; Elaine Little, individually; Timothy Schuetzle, individually and in his capacity as Prisons Director of the Department of Corrections and Rehabilitation; Don Redmann, individually and in his capacity as Warden of the James River Correctional Center; Southwest Multi-County Correctional Center; Leann K. Bertsch, in her official capacity as Director of the DOCR, | * * * * * * * * * * * * * * | |
| | * | |
| Appellees. | * | |

_____

Submitted:  November 13, 2008
Filed: July 2, 2009
_____

Before MURPHY, HANSEN, and RILEY, Circuit Judges.
_____

HANSEN, Circuit Judge.

Two North Dakota prison inmates, Julie Roubideaux and Shelly Grossman, representing a certified class of female inmates (collectively "the Female Inmates"), brought this sex discrimination suit pursuant to 42 U.S.C. § 1983 and Title IX of the Education Amendments of 1972, see 20 U.S.C. § 1681(a), alleging, among other things, that from 1997 to the present, the North Dakota prison system has provided them with unequal programs and facilities as compared to the male inmates.  The district court granted summary judgment in favor of the defendants.  See Roubideaux v. N. D. Dep't of Corr. & Rehab., 523 F. Supp. 2d 952 (D.N.D. 2007).   We affirm.

I.

The undisputed facts indicate that since 1997, female inmates in the custody of the North Dakota Department of Corrections and Rehabilitation ("DOCR") have been housed in four separate prison facilities: the North Dakota State Penitentiary ("NDSP"); the Missouri River Correctional Center ("Missouri River CC"), also known as the farm; the James River Correctional Center ("James River CC"); and the Dakota Women's Correction and Rehabilitation Center ("Dakota Women's CRC"), a facility operated by the Southwest-Multi-County Correctional Center ("SWMCCC") under

contract with the DOCR.[1]  Prior to June 1998, the Female Inmates were all housed with the male inmates either at the NDSP, which has approximately 550 beds, 60 of which were occupied by women, or at the smaller Missouri River CC, which has approximately 150 beds and housed 14 women.  These facilities are both located in North Dakota's capital city of Bismarck.  In June 1998, the James River CC opened in Jamestown, North Dakota, and all of the female inmates who had been housed at the NDSP were transferred there.  The James River CC houses around 374 inmates.

In 2003, the DOCR contracted with SWMCCC to house all of the female inmates together.  SWMCCC is a partnership of six counties created pursuant to a joint powers agreement.  SWMCCC established and operates two correctional facilities.  It renovated a Catholic boarding school in New England, North Dakota (population 527), into the Dakota Women's CRC, a 110-bed women-only correctional facility.  SWMCCC also operates a separate facility, the Dickinson jail.  The Dakota Women's CRC operates pursuant to SWMCCC's contract with the DOCR.  Transfer of all women inmates to the Dakota Women's CRC began in 2003 and was completed by August of 2004.

The Female Inmates filed this lawsuit in 2003 against the DOCR, Elaine Little, Prison Director Timothy Schuetzle, and James River CC Warden Don Redmann (collectively "the State Defendants"), as well as SWMCCC, alleging discriminatory conditions in the facilities and programs offered to women inmates in DOCR institutions in violation of the Equal Protection Clause and Title IX.  At that time, the Female Inmates were still housed at the Missouri River CC and the James River CC with the male inmates, but their transfer to the Dakota Women's CRC was imminent.

---

[1]Some women inmates are also housed at the Tompkins Rehabilitation Center in Jamestown and in transitional living centers in Fargo and Bismarck, but there are no allegations of unequal conditions or programming at these facilities.  See Roubideaux, 523 F. Supp. 2d at 955 n.3.

The complaint alleged that the Female Inmates suffered discrimination on the basis of sex because the State Defendants provided unequal and inferior programs, education, and services in comparison with those offered to the male inmates, and that, "unless enjoined, defendants will transfer female inmates to county jails providing unequal and inferior facilities and programs in comparison to male inmates." (J.A. at 24.) The complaint listed two gender-based North Dakota statutes that the Female Inmates asserted authorized the DOCR to house female inmates in county facilities for more than one year. See N.D.C.C. § 12-47-38 (Supp. 2007); N.D.C.C. § 12-44.1-06.2 (2003) (expired).[2] The district court certified the class pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, finding that the plaintiffs requested primarily injunctive and declaratory relief.

After all of the women had been transferred to the Dakota Women's CRC, the State Defendants and SWMCCC sought summary judgment on the ground that the Female Inmates could no longer demonstrate that they were similarly situated to the male inmates, a necessary element of the equal protection analysis. See Keevan v. Smith, 100 F.3d 644, 648 (8th Cir. 1996) (concluding male and female inmates at different institutions in Missouri were not similarly situated based upon a comparison of a number of factors that made such a comparison unworkable); Klinger v. Dep't of Corr., 31 F.3d 727, 733 & n.4 (8th Cir. 1994) (Klinger I) (same in Nebraska), cert. denied, 513 U.S. 1185 (1995). They also argued that the Female Inmates were not entitled to relief under Title IX because they failed to show discrimination in a program or activity within the meaning of Title IX.

---

[2]Section 12-44.1-06.2 was enacted in 2003 and expired on June 30, 2005; it was replaced with an identical provision, which expired in 2007. See N.D.C.C. § 12-44.1-06.3 (2005) (expired June 30, 2007). Currently, a gender-neutral version exists in § 12-44.1-06(3), but the gender-specific version of 2003 was in effect at the time the Female Inmates were transferred to Dakota Women's CRC.

In response, the Female Inmates asserted that they were not attempting to compare the programming decisions made at different institutions within the system, as did the inmates in <u>Klinger I</u> and <u>Keevan</u>. Instead, they claimed to be challenging the gender-based "policy, based on statute, of removing female inmates from the custody of the [DOCR] . . . and sending them to the custody of local county jails where they are unable to take advantage of the programs and services offered by the [DOCR]." (J.A. at 203.) Thus, they transformed the issue into a facial statutory challenge, alleging that the gender-based classification in the statute resulted in a discriminatory decisionmaking process. They also continued to assert that inequalities in the prison industries program and vocational education programs offered to them violated Title IX.

The district court permitted the Female Inmates to shift the focus of their equal protection claim to the challenged statutes but granted summary judgment to the State Defendants and SWMCCC. The district court concluded that the Female Inmates lacked standing to challenge statutes that did not apply to them and that they had expressly abandoned all equal protection claims aside from the statutory challenge. Alternatively, the district court concluded that the Female Inmates had failed to demonstrate an intent to discriminate on the basis of gender. As to the Title IX claims, the district court concluded that the prison industries program is not an education program within the meaning of Title IX and that the vocational training offered at the Dakota Women's CRC was not shown to be inferior. The Female Inmates appeal.

## II.

We review the grant of summary judgment *de novo*, "viewing all evidence and reasonable inferences in the light most favorable to the nonmoving party." <u>Habhab v. Hon</u>, 536 F.3d 963, 966 (8th Cir. 2008). Summary judgment is proper where there is no genuine dispute of material fact, and the moving party is entitled to judgment as

a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

## A.  Equal Protection
### 1.  Standing

Article III of the United States Constitution limits federal court jurisdiction to justiciable cases and controversies.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60 (1992); Mosby v. Ligon, 418 F.3d 927, 933 (8th Cir. 2005).  When challenging a statute, the plaintiff must show "an injury to [her]self that is likely to be redressed by a favorable decision" and that is "fairly traceable to the challenged statute." Women's Health Ctr. of W. County, Inc. v. Webster, 871 F.2d 1377, 1383-84 (8th Cir. 1989) (internal marks omitted).  The district court concluded that the Female Inmates lacked Article III standing to challenge the two statutes as gender based because they were transferred to the Dakota Women's CRC, which the district court concluded was not a "county jail" or "regional corrections center" within the meaning of the statutes.

"Statutory interpretation is a question of law."  Minn. Supply Co. v. Raymond Corp., 472 F.3d 524, 537 (8th Cir. 2006); Bolinske v. Jaeger, 756 N.W.2d 336, 339 (N.D. 2008).  We are bound by North Dakota's rules of statutory interpretation in reviewing a North Dakota statute.  See, generally, Fargo Women's Health Org. v. Schafer, 18 F.3d 526, 530-31 (1994) (applying North Dakota principles of statutory interpretation in considering the constitutionality of a North Dakota law).  Under North Dakota's rules, our "primary objective in interpreting a statute is to ascertain legislative intent." N.D. State Elec. Bd. v. Boren, 756 N.W.2d 784, 786 (N.D. 2008). "To ascertain legislative intent, we initially look to the statute's language, giving the statute's words their plain, ordinary, and commonly understood meaning." Id.  We construe statutes as a whole and, where possible, harmonize the language used to give meaning to each word and phrase. Id.  "[I]f the language is clear and unambiguous,

we presume the legislative intent is clear from the face of the statute." Von Ruden v. N.D. Workforce Safety & Ins. Fund, 755 N.W.2d 885, 890 (N.D. 2008).

In support of their argument that they have standing to challenge the constitutionality of the two gender-explicit statutes that allegedly facilitated their transfer to the Dakota Women's CRC, the Female Inmates assert that the Dakota Women's CRC is both a "county jail" and a "regional corrections center" within the meaning of the statutes. Although some of the statutory definitions overlap (for instance, a "jail" is defined as a "correctional facility" and a "correctional facility" is defined, in part, as a "jail"), see N.D.C.C. § 12-44.1-01, we believe the statutory language is clear and unambiguous. We consider each statute in turn.

The first challenged statute articulates the DOCR's contracting authority with regard to counties. It provides that, if there is no space in a qualified state facility, the DOCR must contract to house female inmates in a county jail that has the available space, the ability to segregate male and female inmates, and the ability to provide the necessary services and programs stated in the statute. See N.D.C.C. § 12-47-38.[3] The term "county jail" is not specifically defined by the statute. Its plain language indicates that it is a jail operated by a county. A jail is defined as "a correctional facility, including a county or city jail or a regional corrections center." N.D.C.C. § 12-44.1-01(5). A "regional corrections center" is at once both a "correctional

_____

[3]Section 12-47-38 provides in full as follows:
If there is no qualified state facility available, the director of the [DOCR] shall contract with a county for the housing of female inmates in the county jail, to the extent space is available in the county jail. The county jail must be designed in a manner that can adequately segregate the female inmates from the male inmates. Any county with which the department contracts must have available and must provide the female inmates access to educational and vocational programs, chemical dependency treatment programs, mental health programs, medical services, and adequate recreational facilities.

facility" and a "jail" that is owned by several counties or cities. See N.D.C.C. § 12-44.1-01(7) (defining a "regional corrections center" as "a correctional facility established and maintained by more than one county or city . . . for the confinement of inmates"). Because the term "county jail" is not used as a defined term of art, it necessarily includes the whole definition of "jail" modified only by the term "county." The fact that "county jail" is used in the singular is insignificant because words used in the singular in the North Dakota Century Code are meant to include the plural, except where a plainly contrary intention applies. See N.D.C.C. § 1-01-35. Therefore, because the Dakota Women's CRC is a "correctional facility" that is owned by several counties (SWMCCC), it is within the scope of a "county jail" under this statute. And, while this statute sets forth particular restrictions on the DOCR's contracting authority and lists services that must be available at the county facility, it does not articulate any requirement that a county jail or regional corrections center must have operated as such prior to entering a contract with the DOCR.[4]

The second challenged statute works with the first by expanding the length of time that a county correctional facility can house female inmates under a DOCR contract. It authorized the DOCR to contract with SWMCCC to house female inmates for more than one year with specified services. In North Dakota, correctional facilities operated by a county are subject to inspection by the DOCR and a grading system. A grade one classification is the highest classification permitted; it denotes that the DOCR has determined, based upon the facility's "construction, size and usage," that it is fit to confine inmates for not more than one year. N.D.C.C. § 12-44.1-06(1)(a).

_____

[4]The State Defendants and SWMCCC argue that the Dakota Women's CRC is a "state contract facility," but because this phrase is not statutorily defined or otherwise statutorily significant, it is merely descriptive. As such, a "state contract facility" implies nothing more than that the facility now houses inmates pursuant to the terms of a contract with the state.

The challenged statute, § 12-44.1-06.2 (2003),[5] permits the county correctional facility to house female inmates for longer than one year by a contract with the DOCR, when otherwise, a county correctional facility, even with the highest classification, would have been limited to housing inmates for one year. Because of this statute, the DOCR contract with SWMCCC validly authorized the Dakota Women's CRC to house the Female Inmates for more than one year. Absent the challenged statute, the Dakota Women's CRC would otherwise have been limited by statute to housing female inmates for one year at most. Both of the challenged statutes, then, worked together to permit the DOCR and SWMCCC to enter into the contract by which the Female Inmates were transferred to, and are currently housed at, the Dakota Women's CRC for more than one year. Accordingly, the Female Inmates have standing to challenge the statutes.

## 2. Merits of the Equal Protection Claim

"The Equal Protection Clause generally requires the government to treat similarly situated people alike." Klinger I, 31 F.3d at 731 (citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)). "The similarly situated inquiry focuses on whether the plaintiffs are similarly situated to another group for purposes of the challenged government action," and so it is necessary to "precisely define" the claim in order to determine what government action is being challenged. Id. The Female Inmates assert that the gender-based classification on the face of the challenged statutes resulted in a discriminatory process, and we have noted that male and female inmates are similarly situated at the beginning of the decisionmaking

[5]Section 12-44.1-06.2 (2003), which has since expired, provided:
Notwithstanding section 12-44.1-06, a grade one correctional facility that has a contract with the [DOCR] to confine female inmates who have been sentenced to the legal and physical custody of the [DOCR] may confine the female inmate for more than one year in accordance with the terms of the contract. . . .

-9-

process regarding prison programming. Id. at 733 n.4 (noting that a comparison of the *process* by which programming decisions are made is an example of a proper equal protection comparison of a prison's treatment of male and female inmates).

The challenged statutes apply to the DOCR's decisionmaking process of determining where to house female inmates, and the statutes include a gender-based classification on their face. See N.D.C.C. §§ 12-47-38, 12-44.1-06.2. When a statute employs a gender-based classification, we apply a heightened review standard. See United States v. Virginia, 518 U.S. 515, 532-33 (1996). "[T]he state must persuasively show that certain gender-based classifications serve 'important governmental objectives' and that the statute in question is 'substantially related to the achievement of those objectives.'" Ways v. City of Lincoln, 331 F.3d 596, 600 (8th Cir. 2003) (quoting Virginia, 518 U.S. at 533); see also Keevan, 100 F.3d at 650. This heightened standard, however, does not completely proscribe gender-based classifications because the physical differences between males and females are real. Virginia, 518 U.S. at 533. While gender classifications may never be used "to create or perpetuate [a] legal, social, and economic inferiority of women," id. at 534, we are mindful that this claim arises in a prison housing context where the program differences may result from the housing decision and that it is appropriate to segregate male and female inmates on the basis of gender, see Klinger v. Dep't of Corr., 107 F.3d 609, 615 (8th Cir. 1997) ("Klinger II"). "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform," and the difficult job of running a prison system requires "expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." Turner v. Safley, 482 U.S. 78, 84, 85 (1987) (internal marks omitted). The Female Inmates do not challenge the DOCR's general policy of segregating male and female inmates by gender. Instead, they assert that the gender-based classification contained in the challenged statutes resulted in a discriminatory decisionmaking *process* that worked to exclude them from any DOCR programs.

-10-

After a careful review, we conclude that the undisputed evidence in the record raises no inference of discrimination in the decisionmaking process because the statutes substantially relate to the important governmental objective of providing adequate segregated housing for women inmates. The undisputed evidence demonstrates that the DOCR female population as a whole is much smaller than the male population, that sufficient space to house the women in DOCR institutions was becoming an issue as the entire prison population increased, and that, for the many reasons set forth in the complaint and throughout the record, female inmates were in need of a separate facility to better meet their needs. Transferring the same number of male inmates instead of the women would not have resolved these issues for the female inmates. The statutes are substantially related to this important objective in that they expressly require the DOCR to contract with county facilities that have adequate extra space for the female inmates, but only when there is no qualified state facility available and only when the county facility is able to provide segregation from male inmates and an appropriate level of services and programs for the female inmates. If those conditions are met, the county facility is authorized to house the female inmates for more than one year. The statutes substantially further the government's legitimate and important objective of segregating women inmates from male inmates while providing them with the same type of services that are available within the DOCR system. There is no evidence to suggest that any resulting differences in programming from this permissible segregation are caused by gender discrimination.

The Female Inmates argue that the decision to house them at the Dakota Women's CRC was based on economic concerns born out of a desire to benefit western North Dakota economically rather than out of a concern for what was in their best interests. Even assuming this is true, it does not raise an inference of discrimination on the basis of *gender*. The gender-based statutory scheme at issue is not impermissibly discriminatory.

The Female Inmates also attempt to make an as-applied challenge to the statutes, asserting that they are, in fact, being denied the opportunity to participate in any programs operated in the DOCR system and that they are provided programs that are inferior to those offered within the DOCR institutions, even though the contract between the SWMCCC and the DOCR states an express intent to provide programs and services to the female inmates "in parity" with those provided to the male inmates housed in the DOCR institutions. (J.A. at 138.) We agree with the district court, however, that the Female Inmates expressly abandoned this argument by their express assertion that they were "not challenging the programming decisions made by the DOCR as to what programs should be offered at which facilities." Roubideaux, 523 F. Supp. 2d at 964 (internal marks omitted). They voluntarily and consciously shifted the focus of their argument to the decisionmaking process dictated by the gender-explicit statutes. The type of equal protection argument they now couch as an as-applied challenge to the statutes moves beyond the initial decisionmaking process, where we found the male and female inmates to be similarly situated, and seeks to return to the type of program comparisons between institutions that we have held to be unworkable and that the Female Inmates expressly abandoned. See Keevan, 100 F.3d at 649-50 (holding that male and female inmates at different institutions in Missouri were not similarly situated with regard to challenging the assignment of prison industry programs among the various institutions); Klinger I, 31 F.3d at 731 (holding that female inmates at the Nebraska Center for Women and male inmates at the Nebraska State Penitentiary "are not similarly situated for purposes of prison programs and services"). Each particular institution's size, location, and character, resulting from the different types or classifications of inmates housed there, "necessarily will affect the number, type, and length of programs offered." Keevan, 100 F.3d at 649. Any attempt to compare programs between and among different prisons where all of these varying factors are present "is like the proverbial comparison of apples to oranges." Klinger I, 31 F.3d at 733.

The undisputed record here confirms the presence of these types of varying factors. Dakota Women's CRC is smaller and is located in a smaller community than the DOCR institutions. Male inmates in the custody of the DOCR greatly outnumber the female inmates. The DOCR pays more per inmate to house the female inmates. Two-thirds of the female population are classified as minimum custody inmates and the remainder are medium custody inmates, whereas, with the exception of the Missouri River CC (which holds only minimum custody males), the male institutions house predominately medium and maximum custody inmates with comparably longer sentences and longer periods of actual incarceration than the female inmates. As in Klinger I and Keevan, these differences make program comparisons between the prisons unworkable, and in any event, we will not permit the Female Inmates to now revive the claim that they expressly abandoned.

Concerning the Female Inmates' pretransfer equal protection claims that arose out of their incarceration within the DOCR institutions, we agree with the district court that those claims are moot. "In general, a pending claim for injunctive relief becomes moot when the challenged conduct ceases and there is no reasonable expectation that the wrong will be repeated." Mo. Pro. and Advocacy Servs., Inc. v. Carnahan, 499 F.3d 803, 811 (8th Cir. 2007) (internal marks omitted). "A claim is properly dismissed as moot if it has lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract questions of law." Keevan, 100 F.3d at 647 (internal marks ommited). We lack "jurisdiction over cases in which[,] due to the passage of time or a change in circumstances, the issues presented will no longer be live or the parties will no longer have a legally cognizable interest in the outcome of the litigation." Van Bergen v. Minnesota, 59 F.3d 1541, 1546 (8th Cir. 1995) (internal marks omitted). All of the Female Inmates have been transferred out of the NDSP, the James River CC, and the Missouri River CC, and there is no suggestion that they might be returned. Their class certification is for injunctive relief, and any equal protection claim arising out of their previous housing in those other facilities is now moot.

B.  Title IX

"[T]he standard for finding a Title IX violation differs from the standard applicable to a constitutional equal protection claim," and therefore, the "failure to prove an equal protection violation does not preclude [a] Title IX claim as a matter of law." Klinger II, 107 F.3d at 614.  Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," aside from certain listed exceptions, and, significantly, prisons are not among the exceptions.  20 U.S.C. §1681(a).  A state's prison system as a whole qualifies as a program or activity within the meaning of Title IX.  See Klinger II, 107 F.3d at 615 (citing 20 U.S.C. § 1687(1)(A)).  There is no dispute that the DOCR and the Dakota Women's CRC receive federal funding.

The Female Inmates claim that gender-based inequalities exist in the prison industries program and in the vocational programs offered to inmates within the DOCR system.  The district court first concluded, on the undisputed record, that the prison industries operation is not an educational program or activity within the meaning of Title IX, and this conclusion is supported by the undisputed facts.  But see Jeldness v. Pearce, 30 F.3d 1220, 1225-26 (9th Cir. 1994) (holding the question of whether a prison work camp, farm, or prison industries are "educational" programs within the meaning of Title IX is a question of fact).

The express  language of Title IX prohibits discrimination in "any *education* program" that receives federal funds.  20 U.S.C. § 1681(a) (emphasis added).  The term "education" is not defined by the statute or in the regulations governing Title IX, see O'Connor v. Davis, 126 F.3d 112, 118 (2d Cir. 1997), cert. denied, 522 U.S. 1114 (1998), and so we consider its ordinary meaning.  See Crawford v. Metro. Gov't of Nashville and Davidson County, Tenn., 129 S. Ct. 846, 850 (2009) (noting that a term

undefined by statute "carries its ordinary meaning"). The ordinary meaning of education is very broad and could conceivably encompass every experience of life. As relevant here, however, Title IX deals more specifically with "education programs." 20 U.S.C. § 1681(a). See O'Connor 126 F.3d at 118 (indicating that while the 1988 amendments expanded the reach of Title IX to include all departments or branches of an educational institution or program that receives federal funding, the amendment "did not purport to alter the preliminary requirement that the entity funded operate an 'education program.'"). The federal regulations indicate that Title IX prohibits discrimination on the basis of sex "under any academic, extracurricular, research, *occupational training*, or any other education program or activity operated by a recipient" of federal funds. 45 C.F.R. § 86.31(a) (emphasis added). We look to the primary purpose of a program to determine its character.

The "prison industries" program, as described by the undisputed facts on this record, is primarily an inmate work or employment program. It provides inmates with paying jobs, enabling them to make purchases, pay restitution orders, or support their families. The contract between SWMCCC and the DOCR distinctly separates "Inmate Employment," which requires SWMCCC to provide institutional jobs and prison inmate work programs like prison industries (J.A. at 146), from "Education and Vocational Services," which requires SWMCCC to provide basic educational programs as well as vocational education programs (id. at 168-69). The prison industries jobs at the Dakota Women's CRC (a cut and sew operation and a lock/key industry) require higher-level skills than most of the institution jobs.

The Female Inmates assert that there is a question of fact as to whether the prison industries program is an educational program within the meaning of Title IX. They assert that there is evidence from which a trier of fact could consider prison industries to be educational because the DOCR considers the prison industries program to provide an opportunity to learn skills and trades while on the job that will be useful to their ability to obtain employment after incarceration. Accepting these

-15-

facts as true and even though the prison industries provide a beneficial learning opportunity, that benefit is incidental to and is not the primary focus of the prison industries operation. We agree with the district court's conclusion that the type of on-the-job training provided by the prison industries at the Dakota Women's CRC does not transform it from principally a work program into an occupational training program or an educational program. Educational programs that prepare an individual to pursue a particular occupation or trade "typically provide instructors, evaluations, and offer a particular course of training." O'Connor, 126 F.3d at 118. While on-the-job industry training has an educational component in the broadest sense of the term, the record demonstrates that the primary purpose of the prison industries operation as a whole is to provide employment, not educational opportunities. See generally Women Prisoners of D.C. Dep't of Corr. v. Dist. of Columbia, 93 F.3d 910, 927 (D.C. Cir. 1996) ("But even though we do not address the scope of Title IX in the prison context, we admit to grave problems with the proposition that work details, prison industries, recreation, and religious services and counseling have anything in common with the equality of *educational* opportunities with which Title IX is concerned."), cert. denied, 520 U.S. 119 (1997).

Vocational education, on the other hand, is expressly within the scope of Title IX. See 20 U.S.C. § 1687(2)(B) (describing the term "program" to include a "system of vocational education"). See also Klinger II, 107 F.3d at 612 (involving a claim by women inmates that the educational and vocational training opportunities at one prison were inferior to those of male inmates at another). Again, we begin with the premise that "[i]t is beyond controversy that male and female prisoners may lawfully be segregated into separate institutions within a prison system, and that "[g]ender-based prisoner segregation and segregation based upon prisoners' security levels are common and necessary practices." Id. at 615. With this understanding, Title IX requires a comparison of the educational opportunities available to female and to male prisoners within a state's entire system of federally funded correctional institutions, "taking into account the objective differences between the male and female prison

populations and such penological and security considerations as are necessary to accommodate in this unique context." Klinger II, 107 F.3d at 616. Thus, where there exist significant differences between prison populations in gender-segregated prisons, such as unequal population sizes and lengths of stay, Title IX requires a comparison of the educational opportunities to ensure that the female inmates are receiving equal educational opportunities "consistent with those differences." Id. at 616. "'[P]rograms need not be identical in number or content,'" but the female inmates must be provided with "'reasonable opportunities for similar studies and . . . an equal opportunity to participate in programs of comparable quality.'" Id. (quoting Jeldness, 30 F.3d at 1229).

The district court carefully reviewed the vocational programs offered at each institution and found that all inmates have access to computer classes, work force training classes, and college classes. Female inmates at the Dakota Women's CRC also have access to a welding class and classes in basic parenting, social skills, speech, and healthy lifestyles. The other DOCR institutions do not offer the same vocational programs. Male inmates at the James River CC have access to a food service vocational program. The Missouri River CC offers an auto technical program, welding courses, and carpentry courses. Male inmates at the NDSP, at various times, have had access to a noncredit accounting course, a restaurant management class, and a heating and air conditioning program. The district court concluded that, on this record, the differences in the availability and access to certain vocational programs result from the location of the inmates, and that no facts give rise to an inference of inequalities based on gender.

The Female Inmates assert that their evidence demonstrates a growing disparity between the quality and quantity of vocational programming offered at the Dakota Women's CRC and the programs offered at the male DOCR institutions, but their analysis inappropriately combines all of the vocational programs offered at the DOCR's male institutions and contrasts it with the programs offered to the female

-17-

inmates at the Dakota Women's CRC, when in fact, male inmates at one DOCR institution have no access to vocational programs that are offered at another DOCR institution. We agree with the Ninth Circuit that, in the absence of discriminatory residential assignment, a denial of participation in an educational class solely because women do not reside at the prison offering that class does not amount to unequal treatment on the basis of their sex but on the basis of their location. Jeldness, 30 F.3d at 1229.

There are vocational opportunities available to the Female Inmates at the Dakota Women's CRC, though they vary from those offered in the all-male institutions. The welding program does not offer college credit, but there is an opportunity for certification in their welding class, and there is no evidence that the male inmates are earning college credit for welding in another institution. The Female Inmates also complain that the record does not show any female participation in either the welding or computer classes from March 2004 through July 2006, but the requirements for participation are no different than for the male inmates, and the individual female inmate's choice of whether to participate in a particular, available vocational course does not demonstrate unequal programming on the basis of sex. Finally, the Female Inmates' assertion that the male inmates have more work opportunities in which to gain vocational skills does not fall within the scope of Title IX.

## III.

For the reasons stated, we affirm the district court's grant of summary judgment. We also grant the Appellants' request for judicial notice, and we have taken judicial notice of the Policies and Procedures Manual of the North Dakota Department of Corrections and Rehabilitation, Prison Division, attached to the request.

_____